**Morten v. State, No. 215 of the 2017 Term, Opinion by Moylan J.**

UNEXCEPTIONABLE FACTUAL BACKGROUND – HEARSAY TO THE RESCUE, OSTENSIBLY – INITIAL FOCUS – "MY GOD, IT'S A COBRA!" – PRESENT SENSE IMPRESSION – AN ALTERNATIVE HOLDING: THE TRUEALLELE MODALITY OF DNA IDENTIFICATION – THE PRECISE TARGET IN THE CROSSHAIRS: TRUEALLELE SPECIFICALLY, NOT DNA GENERALLY – ADMISSIBILITY VERSUS WEIGHT – "A ROSE BY ANY OTHER NAME . . . " – THE PRETRIAL HEARING ON ADMISSIBILITY – THE PRESUMPTIVE SIGNIFICANCE OF THE HEARING – QUALIFYING AND DISQUALIFYING AN EXPERT WITNESS – A HAMSTRUNG DEFENSE – THEORETICAL RELIABILITY VERSUS <u>AD HOC</u> RELIABILITY – QUANTITATIVE INSUFFICIENCY OF THE SAMPLE – TWO MINOR CONTRIBUTORS OR MORE – RELIABILITY IS BOTH A CONTINUUM AND VARIOUS POINTS ON THE CONTINUUM

Circuit Court for Baltimore City
Case No. 116123014

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 215

September Term, 2017

_____

DELVONTA MORTEN

v.

STATE OF MARYLAND

_____

Friedman,
Beachley,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: September 4, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The two contentions raised by the appellant have one thing in common. They each engage the law of evidence. The first is on familiar turf, however, as we look again at two of the firmly rooted exceptions to the Rule Against Hearsay—the Excited Utterance and the Present Sense Impression. The second contention, by contrast, is at the far and unfamiliar cutting edge of the rapidly evolving science of DNA identification, to wit, at the newly developed TrueAllele testing modality. The appellant, Delvonta Morten, was convicted in the Circuit Court for Baltimore City in a jury trial of first-degree murder and various handgun offenses. On this appeal, he raises the two contentions:

1. that three separate instances of inadmissible hearsay evidence were erroneously admitted against him; and

2. that he was erroneously precluded from adequately challenging the DNA test results introduced against him.

## Unexceptionable Factual Background

Each of these contentions, as we shall fully develop infra, is a strong and persuasive challenge to the prosecution's case. To illustrate the dispositive significance of the suspect evidence in each of the two challenges, we will initially set out just how lackluster a case this would have been in terms of its legal sufficiency without the infusion of the challenged hearsay and minus the arguably dubious DNA test result. What would have been the quality of the case to which no exception could have been taken? Would it have been legally sufficient to have supported the verdict? If necessity begets admissibility, of course, the State's case would have been a lock.

On September 21, 2015, at shortly after 5:00 p.m., Kevin Cannady was killed by a single gunshot to the back of his neck. The autopsy revealed that the bullet shattered the

upper spinal column before lodging in the left cheekbone. The bullet itself was too mangled to permit any ballistic comparisons. The police received the emergency call at 5:11 p.m. and arrived at the scene at 5:15 p.m. The shooting scene was in the 4900 block of Cordelia Avenue immediately north of where it T-intersects with Reisterstown Road. A large crowd had gathered. No one at the scene had been an eyewitness to the shooting.[1] Just at the intersection of Cordelia Avenue and Reisterstown Road, there are located a small grocery store and a car dealership. A surveillance camera from outside the car dealership showed a person wearing a black hoodie and grey pants approaching the victim from behind and shooting him, before running up Cordelia Avenue alongside another person dressed in a burgundy jacket.

Approximately half an hour after the shooting, the police recovered "at the bottom of a tree stump" in the alley behind 4907 Cordelia Avenue, about a block from the shooting scene, a revolver. The firearms inspector was unable to confirm that the bullet taken from Cannady's left cheekbone had been fired from the .38 caliber Smith & Wesson revolver recovered by the police from the alley. They could say, however, that the bullet was a .38 or .357 caliber bullet, which showed "similar class characteristics" with the revolver.

It was two months later that the police first interviewed the appellant. A surveillance video from inside the grocery store showed a number of persons inside the store on

---

[1] Two days later, a Floyd Montague reported to the police that he had given Kevin Cannady a ride and dropped him off on Cordelia Avenue just where it T-intersects with Reisterstown Road. Cannady had just gotten out of the car and was walking toward its rear when Montague, still sitting behind the steering wheel, heard a shot. He looked around and saw Cannady lying on the ground. He immediately drove away and did not, at that time, report anything to the police.

September 21, 2015, at about 4:05 p.m. One of them was wearing a black hoodie. At the November 22, 2015, interview, the appellant acknowledged that he was the person in the grocery store wearing the black hoodie. The outdoor surveillance camera also showed a person wearing a black hoodie walking past the store at 5:01 p.m. and turning into Cordelia Avenue at 5:08 p.m.

That was the State's case without the challenged evidence. At that point, there was no firm linkage between the shooting and the revolver found in an alley about a block away. But for wearing a hoodie, there was no linkage between the appellant and the shooting. There was absolutely no linkage between the appellant and the revolver found in a backyard in the alley. The appellant would have walked.

### Hearsay To The Rescue, Ostensibly

The bare bones of the State's legally insufficient case, however, were soon fleshed out by three rapid-fire infusions of hearsay evidence. These came from an unidentified female caller as anonymous calls to 911 at 5:35 p.m., at 5:41 p.m., and at 5:49 p.m. in the near aftermath of the shooting.

As out-of-court assertions offered, and ultimately received, for the truth of the things asserted, these anonymous calls were self-evidently hearsay. The appellant objected to each. Each was admitted, however, as a well-recognized exception to the Rule Against Hearsay, the first as an Excited Utterance, the second and third as Present Sense Impressions.

Call No. 1 came into 911 at 5:35 p.m., approximately 35 minutes after the shooting. It was accepted as an Excited Utterance. Its substance was as follows:

3

| Operator: | What's the emergency? |
| --- | --- |
| Caller: | I just wanted to report that <u>I saw two guys come down the alley. I heard somebody got shot right here on Reisterstown Road and I saw two guys running up the alley.</u> The alley is on Arcadia. It's right next to 3716[.] And <u>they came down the alley, and it's about the third house to the left.</u> It's two empty yards, and <u>they threw</u> -- <u>they put something down in there.</u> And <u>one guy had on a black hoodie with white on it, like a skeleton design or something,</u> and <u>the other guy had a</u> -- <u>sort of a burgundy jacket, but not a hoodie and</u> -- |
| Operator: | <u>Both black males?</u> |
| Caller: | <u>Yes. Young, about 16/17.</u> |
| Operator: | Okay. <u>And you said it's the alleyway near 3716 Arcadia.</u> |
| Caller: | <u>Yeah.</u> |
| Operator: | Okay, I will have someone to check out that location. You're not quite sure if it's a gun or something or you just know that they threw something back in there? |
| Caller: | <u>I just heard a shot and then I saw them running.</u> |

(Emphasis supplied).

The second call followed, a bare six minutes later, at 5:41 p.m. This hearsay declaration was accepted as a Present Sense Impression.

| Caller: | Well I just wanted you to tell the police. <u>They checking the rear[.] [T]hey going the wrong way.</u> It's on Cordelia. |
| --- | --- |
| Operator: | Okay. So where was the police called? |
| Caller: | Oh, it's -- <u>they were called because of the shooting. It was a shooting around near Reisterstown Road somewhere.</u> |
| Operator: | Okay. You don't know what cross street or which block? |
| Caller: | I think -- no, I don't. <u>It must have been around there about the</u> |

|  |  |
|---|---|
|  | 4900 block of Reisterstown Road but they looking in the wrong direction. |
| Operator: | Okay. Are they looking for anybody? |
| Caller: | They're looking for a gun. |
| Operator: | Okay . . . did you see where anybody put the gun? |
| Caller: | They . . . it was two guys. They threw it, more like buried it, in the houses going along the rear. The police done came down the alley, but they turned to the right. It's the rear of the houses on Cordelia. |
| Operator: | Do you know what block of Cordelia? |
| Caller: | Forty-eight and 49. It's right there at the corner of Arcadia and Cordelia. |
| Operator: | Okay Arcadia at Cordelia, correct? |
| Caller: | Yes. It's a big white truck. [T]hey need to come down the alley where the truck is right there parked[.] These -- people looking in the wrong direction[.] She's in the wrong yard. |
| Operator: | And so is that police? It's a police officer? |
| Caller: | The female officer just went in there. |
| Male Voice: | What are you talking about? Which block of Cordelia is it? |
| Caller: | (To another party) Over there. That's the 49. |

(Emphasis supplied).

The third and final anonymous call came at 5:49 p.m. It was also admitted as a Present Sense Impression.

|  |  |
|---|---|
| Caller: | They looking in the wrong direction. [W]ou1d you tell those police officers . . . . They just left the alleyway where the gun is. |

Operator:     Okay. [S]o where were they at?

Caller:       They came down the alley on the side of the 3716 Arcadia. That's the alley they should be looking down.

Operator:     3716 Arcadia?

Caller:       Yeah, they have a back, but the houses on Cordelia face up that way. The backs face the backs. All I can say is that they left out the alley where the guns, whatever it is they put it down there. They need to come down the alley and look at the empty houses on the left. It's a vacant house with white [b]eige siding.

Operator:     So, it's a house with beige siding?

Caller:       Yeah, look in that area. That's where the gun is. That's where they put something down there, two guys. Okay. They're looking in there now. When I see those suspects, I'll call back.

(Emphasis supplied).

### Initial Focus

We direct our attention to the first of the anonymous 911 telephone calls, the one admitted into evidence as an ostensible Excited Utterance. This by far was the most important of the three hearsay declarations. It is, indeed, dispositive of this appeal.

This out-of-court assertion narrated a large part of the trial evidence. The declarant either heard a gunshot or "heard somebody got shot" and shortly thereafter "saw two guys running up the alley."[2] The declarant established that the person in the hoodie and the

---

[2] In this respect, the assertion is arguably ambiguous. Initially, it gives the impression that the declarant heard a report from someone that there had been a shooting: "I heard somebody got shot right here on Reisterstown Road." Later, however, the declarant gave a seemingly different version: "I just heard a shot." Ipso facto, there is thereby illustrated the value, indeed the necessity, of being able to cross-examine the source of important information and to clarify what needs clarification.

person in the burgundy jacket were accomplices, as they fled the crime scene together. The declarant gave a description of how the two assailants were dressed, one wearing "a black hoodie with white on it, like a skeleton design or something," and the other wearing "sort of a burgundy jacket, but not a hoodie." This was by far the best description of the assailants. It was the declarant, moreover, who described the fugitives as "black males" and as "[y]oung, about 16/17." It was the declarant who asserted that the fugitives had thrown something (it turned out to be a .38 revolver) into a backyard in the alley.

Had this declarant been on the witness stand and under oath, she would have been unquestionably the star witness, the indispensable witness, of the entire State's case. This substantive evidence was absolutely critical. By contrast, any problem with the two Present Sense Impressions is relatively small bore. Our focus is on the ostensible Excited Utterance.

### "My God, It's A Cobra!"

The late Irving Younger, a nationally recognized CLE lecturer on the law of evidence, characterized an Excited Utterance in the following terms: "You will immediately recognize an Excited Utterance when you hear one because **It begins with 'My God' and ends with an exclamation point!**" The caselaw, albeit more prosaically, fully agrees.

The starting point for analysis is Maryland Rule of Procedure 5–802. Hearsay rule.

> Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, **HEARSAY IS NOT ADMISSIBLE**.

(Emphasis supplied).

7

Rule 5–801(c), in turn, defines hearsay.

> (c) **Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

It is Rule 5–803 that then provides exceptions to the Rule Against Hearsay in circumstances where the unavailability of the declarant is not required. Rule 5–803(b)(2) lists as a recognized exception:

> (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

In focusing in on the first anonymous phone call, received by the police at 5:35 p.m., the initial inquiry is that of to whom is allocated the burden of proof. This Court answered that question definitively in Cassidy v. State, 74 Md. App. 1, 8, 536 A.2d 666, cert. denied, State v. Cassidy, 312 Md. 602, 541 A.2d 965 (1988).

> When urging an exception to a rule of exclusion, . . . the burden is upon the proponent of the exception. The correct procedural posture is, "Hearsay will be excluded, unless the proponent demonstrates its probable trustworthiness." Affirmative evidence of trustworthiness, moreover, contemplates something more than the absence of evidence of untrustworthiness. The likelihood of a motive to speak truthfully requires more than the unlikelihood of a motive to lie. Were it otherwise, the nothing-to-nothing ties on these issues would go to the exception rather than to the rule.

(Some emphasis supplied).

What then is the declarant's state of mind that will be offered as proof of probable trustworthiness? The Court of Appeals described that state of mind in Mouzone v. State, 294 Md. 692, 697, 452 A.2d 661 (1982), overruled on other grounds by Nance v. State, 331 Md. 549, 629 A.2d 633 (1993):

8

> The essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence. The rationale for overcoming the inherent untrustworthiness of hearsay is that the situation produced such an effect on the declarant as to render his reflective capabilities inoperative.

(Emphasis supplied; citations omitted).

Dean Wigmore agreed. 6 Wigmore on Evidence Sect. 1747, at 195 (Chadbourn rev. 1976), explains the rationale for the Excited Utterance exception.

> This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts.

(Emphasis supplied; footnote omitted).

McCormick on Evidence Sect. 297, at 854–55 (E. Cleary 3d Ed. 1984), is in full accord.

> First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought.

(Emphasis supplied).

This Court spoke to the Excited Utterance exception in Marquardt v. State, 164 Md. App. 95, 124, 882 A.2d 900, cert. denied, 390 Md. 91, 887 A.2d 656 (2005):

It is up to the proponent of a statement claimed to be an excited utterance to establish that the statement was spontaneous rather than a result of reflection. . . . . In making the determination of whether a statement is properly characterized as an "excited utterance," we examine the "totality of the circumstances."

(Emphasis supplied; citations omitted).

In then assessing whether the necessary conditions for an Excited Utterance have been met, timing is also a critically important factor. The initial excitement must not have abated before the hearsay declaration is made. According to McCormick on Evidence Sect. 297, at 856 (E. Cleary 3d ed. 1984):

Probably the most important of the many factors entering into this determination is the time factor. If the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement. But as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance.

(Emphasis supplied).

In Harmony v. State, 88 Md. App. 306, 320, 594 A.2d 1182 (1991), this Court emphasized that not only must there be an exciting event in the first instance but that the declarant must still be in the throes of the exciting event when he or she makes the out-of-court assertion in issue.

So long as the declarant, at the time of the utterance, was still in the throes of the "exciting event" and therefore not capable of reflective thought, and sufficient foundation was laid to enable the trial court to reach this conclusion, the statement is admissible.

(Emphasis supplied).

As we undertake our appellate review of the ostensible Excited Utterance in this case, we must take note of one other factor that can influence that appraisal. The

10

anonymous telephone caller, the hearsay declarant, in this case was unidentified. There is in such cases a heightened burden on the proponent of the hearsay in proving its trustworthiness. In Parker v. State, 365 Md. 299, 314, 778 A.2d 1096 (2001), Judge Eldridge wrote for the Court of Appeals:

> An examination of the cases in other jurisdictions indicates that, where the identity of the hearsay declarant is unknown, the courts hold that the party seeking to introduce the excited utterance carries a heavy burden to prove the requisite indicia of reliability. It is held that the burden on the proponent is heightened, primarily because it is more difficult to establish personal observation and spontaneity where the declarant is unknown.

(Emphasis supplied). See also Cutchin v. State, 143 Md. App. 81, 87, 792 A.2d 359 (2002).

Measured against these multiple and demanding criteria, the 5:35 p.m. call to the police on 911 does not, we hold, qualify as an Excited Utterance exception to the Rule Against Hearsay. Notwithstanding the clear burden on the State, as proponent of the evidence, to make a case for an utterance being made in the throes of excitement, the initial impression, from the opening words of the declaration itself, is that the declarant is narrating past events, not expressing present excitement. The shooting was not later than 5:11 p.m. and about two blocks away from where the gun was ultimately tossed into a backyard in the alley. The first 911 call was at 5:35 p.m., at the very least 24 minutes after the shooting. The out-of-court assertion, moreover, was completely in the past tense.

> I just wanted to report that I saw two guys come down the alley. I heard somebody got shot right here on Reisterstown Road and I saw two guys running up the alley. . . . . And they came down the alley . . . . [A]nd they threw -- they put something down in there.
>
> . . . .
>
> I just heard a shot and then I saw them running.

11

(Emphasis supplied). It did not take the "two guys" 24 minutes to run two blocks. The wording of that declaration conveys neither a sense of immediacy nor a sense of emotional distress.

There was, moreover, an arguable unresolved ambiguity about the source of the declarant's proffered excitement. The opening reference was not apparently to anything observed by the declarant, by any of her senses, but rather to a second-hand account. "I heard somebody got shot." That would give us a case of hearsay twice compounded, to wit, hearsay within hearsay. Only later did the declaration assert, "I just heard a shot and then I saw them running." Which was it? At the hearing on admissibility, that arguable ambiguity between hearing a shot and hearing about a shooting was never acknowledged, let alone discussed. The State, as proponent of the evidence pursuant to the Excited Utterance exception, never mentioned it. In the last analysis, no factfinding was ever made as to whether the source of the declarant's alleged excitement was hearing a shot or hearing about a shooting. The Excited Utterance exception requires an exciting event. As Joseph F. Murphy, Jr., <u>Maryland Evidence Handbook</u> Sect. 803(C) (4th ed. 2010), explains:

> [T]his exception obviously requires an exciting event, and then <u>makes admissible those statements that (1) describe the event and (2) are made so close in time that the declarant remains under the influence of the excitement produced by the event.</u> This exception does not apply to any statement made after the excitement subsides and, although an exciting event may trigger one's recollection of an event long passed, <u>it is supposed to be limited to only those statements that actually describe the particular event that produced the excitement.</u>

(Emphasis supplied). The declaration here was not "limited to only those statements that actually describe[d] the particular event that produced the excitement." The declaration <u>per</u>

12

se was not about the exciting event, whatever that exciting event may have been.

Lest the State protest that the defense never raised the issue, we hasten to point out that the defense was under no obligation to raise the issue. A party to whom is allocated an affirmative burden of proof on an issue may never offer as an excuse for failing to satisfy that burden that the opposing party failed to raise the issue. As Cassidy v. State pointed out, 74 Md. App. at 8, it is for the proponent of the exception to demonstrate trustworthiness, not for the opponent to establish untrustworthiness. The very allocation of the burden tells us who loses the nothing-to-nothing tie.

The hearing on the admissibility of the substantive content of the telephone calls consumed 24 pages of transcript. It was essentially a quasi-adversarial exchange between defense counsel, arguing against the admissibility of the hearsay, and the trial judge, making the best case for admissibility. For the most part, the State sat quietly by. Assuming that the anonymous caller "heard a shot" rather than was the recipient of a second-hand account that "somebody got shot" on Reisterstown Road, the trial judge made the case that "hear[ing] a shot" might have been more alarming and that that later version of the exciting event was perhaps simply the declarant's "clarification" of her earlier version.

> And then she says, "I heard shots, and then they ran." And I agree with you, there's a difference in the first paragraph and the third paragraph from the bottom. But as I said, maybe she was clarifying what she was saying to the operator. She was a little nervous and upset when she first spoke, and maybe she misspoke and she's clarifying that.

(Emphasis supplied).

Even that version of an emotional shockwave, however, does not ring a convincing bell. We cannot accept that a single gunshot from two blocks away on Reisterstown Road

13

deprived her of her ability to reflect and kept her thus deprived for no less than 24 minutes. She was interested in what she had heard (or in what she had overheard). When she saw two men running away from Reisterstown Road in the alley, she assumed the observation post from which she could survey their movements along several blocks of alleyway. In military language, she moved toward the sound of the guns, not away from it. She showed tactical composure.

The decision to call 911 and make a report to the police was a conscious and reflective choice of a good citizen to help the police solve a crime. It was not an uncontrolled emotional spasm in response to overpowering excitement. "I just wanted to report that . . . ." The declarant's narrative report of what she had seen was a calm and coherent version of what she had observed, embellished by discerning detail of what the two men were wearing and of the precise backyard into which they threw something.

The very subject matter of the out-of-court declaration was not, as a true Excited Utterance is supposed to be, a description of the exciting event and of the declarant's unreflective response to the emotional trauma of the excitement. It was a cool and controlled narrative. If a fellow police officer had been in the declarant's observation post, he or she could not have done a better reporting job than the declarant did. This report was an admirably unexcited utterance.

In <u>Eades v. State</u>, 75 Md. App. 411, 426, 541 A.2d 1001 (quoting <u>Mouzone v. State</u>, 294 Md. 692, 697, 452 A.2d 661 (1982)), <u>cert. denied</u>, 313 Md. 611, 547 A.2d 188 (1988), Judge Karwacki wrote for this Court:

The essence of the excited utterance exception is <u>the inability of the declarant</u>

to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence.

(Emphasis supplied).

The two follow-up calls of 5:41 p.m. and 5:49 p.m., although they make no pretense of being Excited Utterances, were of a piece with that first call of 5:35 p.m. In terms of tone and of communicative purpose, they throw light on the first call. With respect to the mental composure of the caller, nothing changed. The only slight display of emotion on the part of the declarant was her exasperation that the police seemed unable to get their investigative coordinates straight. Nothing else changed. Clearly, she was giving precise directions, not responding to emotional shock.

In looking at the totality of the circumstances, as the caselaw directs us, we hold that the 911 call of 5:35 p.m. cannot qualify as an Excited Utterance exception to the Rule Against Hearsay. The trial court's ruling on admissibility was as follows:

> Okay. Well, when I listen to the tape, I did think she was -- I did sort of pick up a little bit of nervousness in her voice as to the first call. Some people are just nervous, period, when they're speaking to the police.
>
> But for excited utterance, as the State did say, we don't have to have screaming and yelling -- as you know, [defense counsel]. I'm not telling you anything you don't know.
>
> It's subtle, but I find that it is admissible under that exception, which is call one. Calls two and three, of course, would fall under present sense. And I still think she's a little on edge.
>
> It almost appears -- and I agree with you at some point -- it almost appears that she's becoming more of a crime-watcher. I mean, she's at her window, obviously, and she's watching the whole thing from the time she sees whatever -- whoever she saw is running down the alley. And when the police arrive, she watches the whole thing.

15

> I think it's a close call, but I do think when I listen to the tape that she sounds a little nervous, upset, you know, startled. Because I think hearing gunshots could startle people. I don't think she actually has to see it.

(Emphasis supplied).

That, we hold, is a tenuously thin reed on which to hang a major part of the State's case. Without that hearsay, there was no linkage between the shooting and a revolver found in a backyard two blocks away. Even if we allowed for the revolver to have been found randomly, by sheer chance, there was nothing to link the revolver per se with the shooting of Kevin Cannady. Without the hearsay and the revolver as a product of the hearsay, there was no linkage between the appellant and the crime. Throughout the initial closing jury argument by the State and the State's rebuttal argument, the detailed assertions of the hearsay declarant were heavily stressed as part of the substantive narration of what happened in the immediate wake of the shooting. The declarant's description of two men running up the alley was engrafted seamlessly onto the videotape of two men running away from the scene of the shooting.

The court's ruling that the 9:35 p.m. declaration was an Excited Utterance is doubly problematic because of the teaching of Parker v. State, 365 Md. at 314, and Cutchin v. State, 143 Md. App. at 87, that when, as in this case, the hearsay declarant is unidentified, there is a "heightened burden" on the proponent of the hearsay to show inherent reliability. To "pick up a little bit of nervousness in her voice" does not satisfy that heightened burden, particularly in the face of a totality of circumstances all pointing the other way.

Needless to say, this out-of-court declaration neither began with "My God" nor ended with an exclamation point—nor constituted any doctrinal facsimile thereof. The

appellant prevails on this first contention.

## Present Sense Impression

As various exceptions to the Rule Against Hearsay shed the label res gestae and took on free-standing identities of their own, the last to do so was the Present Sense Impression.[3] The archetype was Houston Oxygen Co. v. Davis, 139 Tex. 1, 161 S.W.2d 474 (1942). Following the lead of Federal Rule of Evidence 803(1) and 28 other states, Maryland first recognized the Present Sense Impression as an independent exception in Booth v. State, 306 Md. 313, 508 A.2d 976 (1986). It now appears as Maryland Rule 5–803(b)(1):

> Rule 5–803. Hearsay Exceptions: Unavailability of declarant not required.
>
> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **(b) Other Exceptions.**
>
> (1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

---

[3] In the days prior to Mouzone v. State, 294 Md. at 696–97, in 1982, both the Excited Utterance and the Present Sense Impression, as well as statements of the declarant's present state of mind or physical condition, were referred to by the much older and intellectually awkward term of res gestae. As the generic term for spontaneous utterances of all sorts, res gestae cases often explained that it was not the declarant himself who was speaking but rather the triggering spontaneous event itself speaking through the declarant. For some insight into the pre-1982 world of res gestae, see Cassidy v. State, 74 Md. App. at 9–16. See also 2 McCormick on Evidence Sect. 268, at 351–353 (7th ed. 2013); 6 Wigmore on Evidence Sects. 1745–57, at 191–240 (Chadbourn rev. 1976); Edmund M. Morgan, Utterances Admissible as Res Gestae 31 Yale L.J. 229 (1922); Charles E. Moylan, Jr., Res Gestae, Or Why Is that Event Speaking and What Is It Doing in this Courtroom? 63 A.B.A. J. 968 (1977).

Lynn McClain, <u>Maryland Evidence: State & Federal</u> Sect. 803(1), at 435–36 (3d ed.

2013), explicated the Present Sense Impression:

> In order for a statement to be admissible as a present sense impression, there is no requirement that the declarant have been startled, excited, or upset about the event perceived. This is as it should be, because there is support for the position that unexcited statements tend to be more accurate than excited ones. Thus <u>a sportscaster giving a "play by play" account is stating present sense impressions, as is a police officer speaking into a wire and describing what she is seeing.</u>
>
> <u>The statement must have been made either during the declarant's perception of the event or condition in question or immediately afterwards. Anything more than a slight lapse of time</u> between the event and the statement <u>will make the statement inadmissible.</u>
>
> Before a present sense impression will be admissible, <u>there must be a showing that the declarant was speaking from first-hand knowledge.</u> As the Maryland Court of Appeals has explained, "in some instances the content of the statement may itself be sufficient to demonstrate that it is more likely than not the product of personal perception, and in other instances extrinsic evidence may be required to satisfy this threshold requirement of admissibility."
>
> <u>A present sense impression may even be admissible if made by an unidentified declarant.</u>

(Emphasis supplied; footnotes omitted).

In a similar vein, <u>McCormick on Evidence</u> Sect. 298, at 860 (E. Cleary 3d ed. 1984),

observed:

> Although [present sense impression] statements lack whatever assurance of reliability there is in the effect of an exciting event, other factors offer safeguards. First, <u>since the report concerns observations being made at the time of the statement it is safe from any error caused by a defect of the declarant's memory. Second, a requirement that the statement be made contemporaneously with the observation means that there will be little or no time for calculated misstatement.</u>

(Emphasis supplied; footnotes omitted). <u>See also State v. Jones</u>, 311 Md. 23, 30, 532 A.2d

169 (1987); Hunt v. State, 312 Md. 494, 504 n.4, 540 A.2d 1125 (1988); Washington v. State, 191 Md. App. 48, 92–95, 990 A.2d 549, cert. denied, 415 Md. 43, 997 A.2d 792 (2010).

In the present case, both the second call of 5:41 p.m. and the third call of 5:49 p.m. were admitted as Present Sense Impression exceptions to the Rule Against Hearsay. Neither counsel made any argument with respect to those two calls and the ruling was brief: "Calls two and three, of course, would fall under present sense."

Indeed, those two supplemental calls neither added to nor subtracted from the State's case. We have already held in favor of the appellant with respect to this omnibus hearsay contention, but brief comment on the Present Sense Impression is nonetheless appropriate for future guidance.

The second call, that of 5:41 p.m., consisted of nine statements by the declarant. The first was legitimately a Present Sense Impression. The other eight were not. The first statement was:

> Well I just wanted you to tell the police. They checking the rear[.] [T]hey going the wrong way.

The remaining eight statements consisted largely of a question and answer exchange between the declarant and the officer taking the call, as the declarant narrated past events in order to bring the officer up to date. "There was a shooting." "They're looking for a gun." "[I]t was two guys. They threw it, more like buried it[.]" None of these is remotely a Present Sense Impression. As Joseph F. Murphy, Jr., Maryland Evidence Handbook Sect. 803(B) (4th ed. 2010), clearly explained:

19

> If the declarant is speaking in past tense, he is unlikely to be stating a present sense impression. The rule against hearsay is based upon our belief that the factfinder should observe each witness in order properly to evaluate perception, memory, narration, and sincerity. The present sense impression becomes inadmissible hearsay when the declarant stops talking about what he is now observing and starts talking about what he observed at some time in the past.

(Emphasis supplied).

The third and final call, that of 5:49 p.m., consisted of four statements by the declarant. The first might arguably have been largely a Present Sense Impression as it said, in effect, "I can see the police searching a backyard—but it's the wrong backyard." The narrative then reverted to reiterating what had earlier been said in the 5:35 p.m. call and it had been in the past tense even then. "That's where the gun is. That's where they put something down there, two guys."

But for the relatively venial sin of overemphasis, these two additional calls did not add much of substance to the State's case. They do illustrate, however, how easy it is for a seemingly simple declaration to wander randomly back and forth between present impression and past narration.

### An Alternative Holding: The TrueAllele Modality Of DNA Identification

With our holding that the admission against the appellant of the hearsay telephone messages was reversible error, it would become unnecessary to address the appellant's second contention. Yet we shall. That contention is that the appellant was erroneously denied his constitutional right to present a meaningful defense against a DNA identification made of him. Significantly, what is involved is a new and still controversial modality of

20

DNA identification testing known as TrueAllele. As of trial time, that new testing modality had been used in Baltimore for approximately one year. It apparently had been used nowhere else in Maryland. The actual merits of the testing techniques, moreover, have never been analyzed by an appellate opinion in Maryland. Because this is a case of first impression and because of the inevitably growing importance of this forensic technique in future cases, it behooves us to engage in a full analysis of the contention and to render an alternative holding in this case.

Once the jettisoned revolver was found in a nearby backyard, there ensued a very different type of legal wrangle. With this second contention, we find ourselves in a new and largely unexplored corner of DNA identification science. Once the anonymous telephone caller and the police began reading off the same navigational page, the pertinent backyard was soon located. Officer George Githara was a member of the team searching the alley behind Cordelia Avenue for a handgun. He described the total search time as consuming approximately 30 minutes. Near the end of that time, a telephoned direction caused the officers to switch their search area from behind the 4800 block of Cordelia Avenue to the rear of 4907 Cordelia Avenue. Officer Githara there spotted the handgun near the bottom of a tree stump, right inside the alley fence. The officers stood watch over the weapon until it was taken into custody by Kelly Figueroa, a technician with the Baltimore City Police Crime Lab. At the crime lab, the gun was first dusted for fingerprints. None were found. The handgun was then swabbed for possible traces of DNA.

The key witness for the State was Thomas Heibert, the DNA analyst for the Baltimore City Police Department. Mr. Heibert was accepted as an expert in forensic DNA

analysis. He analyzed the swab of DNA taken from the handgun and compared it with a DNA sample taken from the appellant (oral swabs). That initial comparison, received as State's Exhibit No. 22, was inconclusive. Mr. Heibert described it:

> Q. And what were your findings when you added [the appellant's] swabs to the comparison?

> A. [The appellant] could neither be included nor excluded. And what that means is there was a likelihood ratio, a positive indication, that he was present, but not at a level that I could say that he is definitely included.

(Emphasis supplied).

A subsequent comparison, received as State's Exhibit No. 23, made an adjustment in the comparison. Instead of comparing the appellant's DNA, one on one, with the sample taken from the gun, the adjusted comparison assumed that there were two contributors to the DNA sample taken from the gun and that the appellant was simply a minor contributor. Apparently it takes less of a match to list one as a minor contributor than it does to make a match generally. Mr. Heibert described the critically different result.

> Q. Okay. So after you put in that information regarding Heather Ladd, what determination did you make from TrueAllele?

> A. The match score between [the appellant] and the minor contributor increased to the point where I could say he was included.

(Emphasis supplied).

The statistical difference was decisive as the "match score . . . increased to the point where I could say he was included." Also decisive was the role of Mr. Heibert in interpreting the shift in the match score. These factors will be significant when we consider the vital role of statistical analysis in DNA testing infra. In any event, this second DNA

comparison involving the appellant was, for all intents and purposes, the State's entire case against the appellant. Without this test result labeling the appellant as a minor contributor to the DNA on the gun, there was no meaningful linkage between the appellant and the crime.

At this point, our focus turns to the subject of DNA testing, especially to the particular DNA test employed in this case, and to the variable factors that may enter into the conducting of the test in issue. Most significantly, our analysis focuses 1) on the opportunity of the defendant to challenge the very utilization of the particular test employed in the first place, 2) on the circumstances that went into the conducting of such a test, and 3) on the dispositive statistical interpretation of the ostensible test results.

## The Precise Target In The Crosshairs:
## TrueAllele Specifically, Not DNA Generally

As a forensic investigative technique, the use of DNA comparison is cutting edge science. First used in a criminal case in the United Kingdom in 1986, it was adopted in the United States by the FBI in 1988. Maryland cases abounded with the first wave. This Court recognized the validity of DNA matches for identification purposes in Cobey v. State, 80 Md. App. 31, 559 A.2d 391, cert. denied, 317 Md. 542, 565 A.2d 670 (1989). DNA testing received the imprimatur of the Court of Appeals in Judge Raker's landmark opinion in Armstead v. State, 342 Md. 38, 673 A.2d 221 (1996). It has regularly been recognized over the course of the intervening years. See Phillips v. State, 451 Md. 180, 152 A.3d 712 (2017); Varriale v. State, 444 Md. 400, 119 A.3d 824 (2015); Young v. State, 388 Md. 99, 879 A.2d 44 (2005); Gross v. State, 371 Md. 334, 809 A.2d 627 (2002); Williams v. State,

23

342 Md. 724, 679 A.2d 1106 (1996); <u>Phillips v. State</u>, 226 Md. App. 1, 126 A.3d 739 (2015); <u>Diggs and Allen v. State</u>, 213 Md. App. 28, 73 A.3d 306 (2013), <u>aff'd</u>, <u>Allen v. State</u>, 440 Md. 643, 103 A.3d 700 (2014).

What is before us in this case, by contrast, is a new development in DNA law that has never yet been analyzed, nor even recognized, in the Maryland caselaw. It is a new and still controversial matching technique known as the TrueAllele test. It is, by definition, a less reliable DNA test, but one necessary to resort to by the police when the circumstances do not permit a more reliable test.

An accepted expert on DNA analysis and the DNA analyst for the Baltimore City Police Department, Thomas Heibert, testified at the pre-trial suppression hearing. He explained that TrueAllele is resorted to when the DNA sample to be tested is problematically small or has been contaminated or where there are multiple donors of the DNA in question.

> Q. You indicated that the lab just started using TrueAllele about a year ago. Do you know why the lab started to use TrueAllele?
>
> A. <u>Our previous interpretation methods were not sufficient for the types of samples we were receiving. So we were getting a lot of samples that we could not interpret manually</u>, so we needed the assistance of a computer program.

(Emphasis supplied).

The revolver in this case presented just such problems, problems that precluded more reliable manual testing and necessitated reliance on TrueAllele.

> A. <u>The revolver was a low-level mixture with a lot of uncertainty within the profile.</u>

. . . .

Q. And what do you mean when you have a low-level mixture?

A. So there's not a lot of DNA there, and there's DNA from more than one person.

Q. Now, do you have parameters set on when you can use TrueAllele on, for instance, a low-level mixture?

A. The parameters for TrueAllele are really up to the analyst to decide. So if they feel they cannot do the sample manually, then they would put it into TrueAllele.

(Emphasis supplied).

The analyst always looks first to see if more reliable manual testing is possible and

only resorts to TrueAllele when manual testing is not feasible.

Q. So in regards to the swabs from the revolver -- you indicated that you used TrueAllele. Can you explain that process to the judge, what exactly you did?

A. So I will receive the raw data. I will review it manually to determine whether or not I can make a manual determination. If I cannot, then I will upload it to the TrueAllele system.

(Emphasis supplied).

Mr. Heibert acknowledged that there was "so little DNA there" that it was difficult

to determine whether even that little bit had suffered degradation.

THE WITNESS: It's possible that there is some degradation. It's difficult to determine because it's such a low-level profile. So, there's so little DNA there, it's hard to determine whether it's degraded or whether it's just due to the low amount of DNA.

(Emphasis supplied).

The TrueAllele technique is on the far periphery of DNA testing and has never been

25

the subject of analysis in any Maryland reported opinion. This is truly a case of first impression.

## Admissibility Versus Weight

The trial in this case began on Monday, January 23, 2017. On the last working day before that, on Friday, January 20, 2017, the Court of Appeals filed its opinion in the case of Phillips v. State, 451 Md. 180, 152 A.3d 712 (2017). That filing dramatically changed the schedule. Over the course of that intervening weekend, the midnight oil was burned and trial strategies were drastically revamped. A case that had been destined to be primarily a strategic battle royal over the threshold admissibility of TrueAllele evidence turned, instead, into a tactical battle over how a defendant might challenge and diminish the weight and persuasiveness of such evidence. The anticipated test case did not involve TrueAllele testing specifically. That testing modality had not yet been significantly recognized. The expected battle was over the admissibility of DNA testing generally.

The defense argument in the Phillips case was that DNA test results generally should not be admitted into evidence unless the proponent could, on a case by case basis, satisfy the rigorous demands of a Frye-Reed hearing.[4] The State, on the other hand, argued that

---

[4] In Phillips v. State, 451 Md. at 184–85 n.1, Judge Getty provided a concise explanation of a Frye-Reed hearing.

Frye-Reed refers to Maryland's standard for determining the admissibility of scientific evidence. "[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field." Reed v. State, 283 Md. 374, 381, 391 A.2d 364 (1978) (citing Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). A Frye-Reed hearing is the pretrial hearing at which the proponent of the scientific evidence must

DNA evidence was automatically admissible under Maryland Code, Courts and Judicial

Proceedings Article ("CJP"), Sect. 10–915.

The case concerning admissibility initially came before the Court of Special

Appeals in Phillips v. State, 226 Md. App. 1, 126 A.3d 739 (2015).[5] As of that time, CJP,

Sect. 10–915(b) provided:

> (b) In general.—A statement from the testing laboratory setting forth
> that the analysis of genetic loci has been validated by standards established
> by TWGDAM [The Technical Working Group on DNA Analysis Methods]
> or the DNA Advisory Board is sufficient to admit a DNA profile under this
> section.

This Court's opinion, 226 Md. App. at 8, noted the very obvious initial problem that

neither of the validating agencies was, as of 2015, still in existence. We observed:

> The issue is made more complicated because neither TWGDAM nor
> the DNA Advisory Board remain in existence. Accordingly, compliance is
> impossible today.

---

> establish such general acceptance if the admissibility of the evidence is
> challenged.

[5] Although the name "TrueAllele" was never used and the actual merits of such a
testing modality were never analyzed by this Court, the actual facts in the case bore some
resemblance to what is before the Court in the present case. The Prince George's County
DNA laboratory was dealing with "interpretation of complex, low copy number DNA
samples." Phillips v. State, 226 Md. App. at 5 n.3, further defined what the laboratory was
dealing with.

> A "complex" DNA sample refers to a DNA sample that includes genetic
> material from three or more individuals. "Low copy number" DNA analysis
> "involves testing minuscule amounts of DNA that fall below the (somewhat
> amorphous) stochastic threshold—around 100 picograms or less."

(Emphasis supplied; citations omitted). Neither the opinion of this Court nor of the Court
of Appeals, however, was called upon to address the merits of the DNA testing under such
circumstances.

27

(Emphasis supplied; citation omitted).

After a thorough analysis of "The Problem of Obsolete Statutes," this Court concluded that automatic admissibility was not available and that a <u>Frye-Reed</u> hearing was, therefore, necessary. The opinion then went on to hold, however, that the <u>Frye-Reed</u> hearing conducted by the trial court fully satisfied all required criteria and that the DNA test results in <u>Phillips</u> were, indeed, admissible.

On certiorari, the Court of Appeals agreed with this Court that the DNA test results were admissible. The Court of Appeals did disagree with the Court of Special Appeals, however, on the subject of automatic admissibility. It agreed that the two validating agencies expressly mentioned in the earlier version of CJP, Sect. 10–915(b) were, indeed, no longer in existence. In a protracted analysis, however, it then concluded that the standards promulgated by those agencies were still in existence, albeit enforced by other institutions. Its conclusion was that validation requires only that the standards themselves be satisfied, regardless of whether the agencies that promulgated the standards still existed or not. Under the circumstances, the Court of Appeals held that the decision of this Court that a <u>Frye-Reed</u> hearing was required was wrong. It did not disagree with this Court's assessment of the <u>Frye-Reed</u> hearing but simply held it to have been unnecessary. Both Courts agreed, however, that the DNA evidence in the <u>Phillips</u> case was admissible.[6]

In disposing of Phillips's alternative argument, challenging the adequacy of the test

---

[6] The problem is no longer so complicated. A 2016 amendment to CJP, Sect. 10–915(b)(3) now provides expressly that validation by "The Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories" will satisfy the statutory requirement.

on "complex, low-template DNA," the Court of Appeals held that, in the face of automatic

admissibility, the merits of such a test are irrelevant to the issue of admissibility.

> The trial court's findings that the QAS [Quality Assurance Standards]
> did not address complex, low-template DNA and that the Prince George's
> County Laboratory did not have any protocols for analyzing this category of
> DNA, are not clearly erroneous; however, those findings are not relevant to
> the admissibility of DNA evidence under CJP § 10–915. All that is required
> for admissibility under the Statute is "[a] statement from the testing
> laboratory setting forth that the analysis of genetic loci has been validated by
> standards established by TWGDAM or the DNA Advisory Board," and
> compliance with the notice requirements. As we stated above, the Laboratory
> satisfied these requirements with respect to the DNA evidence admitted
> against Mr. Phillips. Therefore, the DNA evidence was automatically
> admissible under the Statute.

451 Md. at 205 (emphasis supplied).

On one critical issue the Court of Appeals and the Court of Special Appeals were in

rock solid agreement. Resolving the admissibility issue, as a matter of law, does not end

the case. There still must be adjudicated the weight and persuasiveness of the DNA test

results, as a matter of fact. This Court recognized the distinction.

> Any challenges to the Prince George's County DNA laboratory's lack of a
> set stochastic threshold properly goes, and did go, to weight rather than
> admissibility.

226 Md. App. at 21 (emphasis supplied; footnote omitted).

### "A Rose By Any Other Name . . . "[7]

The staging of this particular courtroom drama (the admissibility hearing scheduled

for Monday) turned out to be eccentric, particularly in the hastily improvised adaption of

its opening act. On Friday, yet unaware of the Court of Appeals opinion being filed that

---

[7] William Shakespeare, Romeo and Juliet, Act II, Scene 2.

afternoon, all parties were in final preparations for an impending Frye-Reed hearing on Monday. The subject was to be the general acceptance in the scientific community of the TrueAllele modality of DNA identification. By late Friday afternoon, however, Phillips v. State had become the new controlling reality. The results of the DNA testing were automatically admissible and no Frye-Reed hearing was appropriate. Would Monday's scheduled hearing be cancelled?

The window for readjustment was tight. It was as if a bare weekend were available for replanning the Invasion of Normandy. Forensic ingenuity, however, is not to be disdained. If CJP, Sect. 10–915(b)(3) now proclaimed that a performance of Hamlet (Frye-Reed) would not be held, a resilient cast was determined to deliver its well-rehearsed lines nonetheless, but, in order to comply with the new statutory directive, it had to retitle the play Macbeth. The "To be or not to be" soliloquy would simply be delivered by the Thane of Cawdor. Lest this metaphor be deemed far-fetched, it represents precisely what had happened to this case by the afternoon of Monday, January 23, 2017.

The retitling of Monday's pre-trial performance was accomplished relatively painlessly. After a little hemming and hawing back and forth by both State and defense, the judge announced that a Frye-Reed hearing would no longer be on the docket.

> THE COURT: Okay. So, then, there's no need for a Frye-Reed hearing in this case. The DNA is automatically admissible in this case.

(Emphasis supplied).

The admissibility battle would not be waged at Elsinore, as defense counsel deftly shifted the ground of attack from Frye-Reed to due process. Defense counsel articulated

the shift:

> There are statements in <u>Armstead</u>, which I can bring the Court's attention to, and also in <u>Phillips</u> that says that <u>the fact that the statute has been complied with does not inoculate the statute if the Defense is</u>, in fact, <u>asserting that the DNA analysis is inadmissible under due process grounds</u> -- both procedural due process grounds and substantive due process grounds -- <u>because the analysis is not reliable.</u>
>
> What happened in <u>Phillips</u>, Judge, is he gave up that. <u>He waived that assertion, that due process</u> was not -- that due process <u>was violated.</u> Here, we're not waiving that assertion, Your Honor.
>
> So basically what we're saying is, <u>under due process</u>, the bottom line -- <u>the Defense has the right both substantively and procedurally to ensure that the Defendant is not convicted under unreliable scientific evidence. That's his substantive right under due process</u>, Judge.
>
> Procedurally, <u>we must have the opportunity to challenge from a due process standpoint</u> -- pretrial, that is -- unreliable and inadmissible evidence.

(Emphasis supplied).

The judge did briefly evidence some chagrin at the sudden and unexpected shift in the court's calendar, but ultimately went along with the due process hearing.

> THE COURT: Well, you didn't -- were you -- <u>when did you decide you were going to be proceeding on due process?</u> Because <u>you didn't send any of this to my clerk or any of these cases.</u>

(Emphasis supplied). It turned out to be simply a <u>Frye-Reed</u> hearing by another name.

Although the name of the performance would be different ("due process hearing" instead of "<u>Frye-Reed</u> hearing"), the theatre would not be dark that afternoon. The shift, however, did give rise to an oddity that no one seemed to notice. In a <u>Frye-Reed</u> hearing, it would be the State, as proponent of the TrueAllele testing modality, that bore the burden of proof. In a constitutional due process attack on an already established procedure, on the

31

other hand, it would be the appellant who bore the burden of proof to establish the due process violation. In this case, inexplicably, it was the State which assumed the burden of proof, just as if this were a <u>Frye-Reed</u> hearing. Indeed, in almost every respect, the admissibility hearing in this case did proceed exactly as a <u>Frye-Reed</u> hearing would have proceeded. Fortunately, there was no tie in ultimate persuasion and any misallocation of the burden of proof, therefore, made no difference.

## The Pretrial Hearing On Admissibility

The pretrial hearing on the TrueAllele modality (whatever name we put on it) consumed 222 pages of transcript. Each side called one witness. Thomas Heibert was accepted as an expert witness for the State. His testimony consumed 100 pages of transcript. Dr. Charlotte Word was accepted as an expert witness for the appellant. Her testimony consumed 88 pages of transcript. The hearing explored in great depth both the strengths and the substantial weaknesses in the relatively new TrueAllele modality. This will ultimately take on significance when we explore the entitlement of the appellant to expose those substantial weaknesses to the jury as he tried to challenge the weight to be given to such evidence.

At the conclusion of the hearing on Monday but before making her ruling on Tuesday morning, the judge opined as to what the jury would probably have to do with the controversial DNA evidence.

> [B]asically <u>what this really comes down to is the battle of the two experts.</u> And, you know, <u>the jury will believe which expert they wish to believe</u>, or they may not believe any expert, which is, you know, part of what I instruct them on.

(Emphasis supplied). The assumption seemed to be that the trial on the issue would be a recapitulation of the admissibility hearing. That assumed, of course, that the jury would ultimately get to hear the same expert testimony that the admissibility hearing had enjoyed. That, however, was not to be and that was reversible error.

The trial judge ruled that the use of the TrueAllele methodology did not offend due process of law and that the DNA evidence in this case was, pursuant to CJP, Sec. 10–915(b) and Phillips v. State, 451 Md. at 180, admissible in evidence. The judge's conclusions were all with regard to admissibility, as a matter of law. The judge acknowledged, in passing, that the various alleged flaws and weaknesses in the TrueAllele methodology would appropriately be for the jury to consider as it then determined the weight to be given to such evidence. What was proper evidence to challenge admissibility, as a matter of law, should ipso facto be proper evidence to challenge the weight of evidence, as a matter of fact.

> Maryland courts distill the principle that the essence of due process fundamental fairness inquiry is whether there is a balanced, fully-explored presentation of evidence. This balance, in turn, depends on the jury's ability to weigh the evidence and the Defendant's opportunity to challenge the evidence.
>
> This Court concludes that because the jury will be presented with both TrueAllele and manual calculations with full explanations of both methods, it will have the opportunity to weigh the contested evidence.
>
> This Court cannot say that the data is so unreliable on its face. Mr. Morten can attack the weight to be given to the DNA evidence based on the lack of accepted standard[s] for analyzing mixtures of low-level DNA samples by either cross-examining Mr. Heibert at trial or calling Dr. Word as a rebuttal expert, as he did in the motion hearing.

(Emphasis supplied). What was there anticipated, however, never came to pass.

33

## The Presumptive Significance Of The Hearing

The ruling at the conclusion of the hearing on the admissibility of the DNA evidence was not at all unexpected. That ruling is not in dispute. The hearing should nonetheless have served as a very valuable dress rehearsal for the trial that followed. Whatever evidence was competent to prove or disprove the very admissibility of the TrueAllele modality as matter of law should ipso facto have been competent for the lesser task of adding to or subtracting from its persuasive weight as a matter of fact. Whatever witness was competent to prove or disprove the very admissibility of the TrueAllele modality as a matter of law should ipso facto have been competent for the lesser task of adding to or subtracting from its persuasive weight as a matter of fact. There was no apparent reason that all of the evidence pertinent at the hearing should not have been equally pertinent at the trial proper. Between the hearing and the trial proper, however, there occurred an inexplicable disconnect. And therein lay the fatal trial error.

## Qualifying And Disqualifying An Expert Witness

The trial on the merits initially proceeded uneventfully. Thomas Heibert's expert testimony for the State essentially replicated his testimony at the pre-trial hearing on admissibility. After the appellant's motion for a judgment of acquittal was denied, the appellant called Charlotte Word as his single witness. At that point, a discernible chill fell over the trial. What had seemed to be a relatively free and open mood of receptivity suddenly turned a lot stingier.

The State's entire case against the appellant depended on the jury's acceptance of the TrueAllele test results linking the appellant to the revolver found in the backyard of

4907 Cordelia Avenue. The entire defense of the case, on the other hand, depended on persuading the jury that the new and controversial TrueAllele testing modality was not reliable enough to be worthy of belief, at least not worthy enough to support belief beyond a reasonable doubt. It presumably would take a lot less to erode its ultimate persuasiveness than to bar its very admissibility. Subject to challenge was not only the inherent reliability of the TrueAllele testing modality itself but also the way in which it was administered in this particular case. That defense, in turn, depended entirely on the testimony of Dr. Word.

The testimony that Dr. Word gave at the pre-trial admissibility hearing would have amounted to a strong case for the defense if repeated at the trial on the merits. The appellant's contention that his right to present a defense was erroneously undermined by the exclusion of much of his evidence attacking the reliability of TrueAllele testing amounts to the contention that Dr. Word was unduly prohibited from fully presenting her views about TrueAllele testing.

Although Dr. Word had testified as an expert witness without any limitation at the pre-trial admissibility hearing and although her expert status at that earlier hearing paralleled, if it did not surpass, that of Mr. Heibert, her re-qualification as an expert witness at the trial proper turned into a virtual mini-trial. Her ultimate acceptance as an expert

witness was grudgingly stingy and warily circumscribed.[8]

She had received her Bachelor of Science degree in biology from William and Mary and her Ph.D. from the University of Virginia, specializing in molecular biology and immunology. She did post-graduate work in those specialties for three and one-half years at the University of Texas Southwestern Medical School. She then served on the faculty of the New Mexico School of Medicine for five and one-half years. At the time of trial, she was employed as a consultant in the area of human DNA identification testing.

She further explained that from 1990 to 2005, she worked for Cellmark Diagnostics in Germantown, Maryland, a private laboratory doing human DNA identification testing both for biological relationships and paternity and for criminal case work. Since 2005, she has worked as a private consultant in the field of DNA identification testing.

At Cellmark, one of Dr. Word's major functions was as a technical reviewer of casework. Dr. Word described the job of a technical reviewer.

> When samples come into the laboratory, the case and the samples get assigned to a DNA analyst who does all the physical work, does all the technical work, documents everything, generates the report, the data and writes the draft report. It's required that a second person called the technical reviewer review all the work that's been done, checks to see that the standard procedures were followed, that the documentation is appropriate, does a second independent interpretation of the data and then co-signs the report stating that that individual agrees with the results and conclusions as they're reported in the report.

---

[8] Why Thomas Heibert and Charlotte Word, having both been accepted as expert witnesses for Monday's hearing on admissibility, had to qualify all over again for the trial proper is by no means clear. If anything, the bar for being accepted as an expert would presumably have been higher at the earlier hearing, where admissibility could actually be barred, as a matter of law, than at the trial proper, where persuasive weight need only be arguably impugned, as a matter of fact. That issue is not before us, however, except to raise an eyebrow.

(Emphasis supplied).

Dr. Word also described her experience in reviewing DNA data from other laboratories.

> So <u>one of my other job functions when I was at Cellmark was to do consultation work with attorneys to help them with cases</u> where they had work done -- <u>work performed by another laboratory.</u> So this would be prosecutors and Defense attorneys who wanted a second opinion or additional information regarding a case. So since 1990 I -- and <u>the whole time I was at Cellmark I did consulting work reviewing case work that had been done by other laboratories and providing my opinion on what I thought about the testing, how it was done, whether I agree with the data.</u> And then since 2005, that's been my major form of work. But along that as well <u>I've done consulting work for crime labs</u> and <u>I have been hired as a contract technical reviewer for several different crime laboratories</u> where I functioned in the same way that I did at Cellmark, doing the second review on their case work in their laboratory.

(Emphasis supplied).

Dr. Word also explained that for the United States Department of Justice, she had served on a subcommittee of the Commission on the Future of DNA Evidence, looking at the new field of DNA testing and how it would be used in criminal courts. Dr. Word also served on a subcommittee looking at the use of DNA testing in post-conviction testing.

Dr. Word is also an associate editor of the <u>Journal of Forensic Sciences</u> and is a reviewer for an international journal called <u>Forensic Science International: Genetics</u>. She has reviewed "probably well over a million" DNA mixtures and delivered countless lectures or training presentations on DNA mixture analysis. Dr. Word has provided DNA training to judges. She has testified as an expert in the field of forensic DNA analysis in over 300 cases. She had, moreover, been accepted as an expert in the field of statistical frequency calculations.

On cross-examination, the State scrounged for some subset of the larger field in which Dr. Word had not worked. In cross-examining Dr. Word about her expertise, the State seized on the fact that she had not actually taken a TrueAllele sample all the way through the testing process.

> Q. Dr. Word, at a previous hearing you indicated that you had never actually used any of the probabilistic genotype software such as STRmix or in this case TrueAllele; isn't that correct?
>
> A. I haven't taken a sample all the way through. I have a very tiny bit of experience on looking at data in the TrueAllele system a few years ago, but it's minimal.

When then asked if it accepted Charlotte Word as an expert, the State was carefully circumspect in its agreement.

> THE COURT: Any objection?
>
> [THE STATE]: If she's only designated in the field of forensic DNA analysis and interpretation the State has no objection.
>
> THE COURT: All right. The witness will be received as an expert in the field of forensic DNA analysis and interpretation.

(Emphasis supplied).

To what extent, if any, that pinched and grudging acceptance might later inhibit Dr. Word's testimony was by no means yet clear.

### A Hamstrung Defense

After the voir dire examination of Charlotte Word to establish her qualification as an expert witness had concluded, her remaining testimony at trial consumed 93 pages of transcript. Her testimony was the appellant's sole defense. Without that testimony, the "black box" of DNA analysis proclaimed to the jurors that the appellant's DNA was on the

38

revolver, and there was no one to contradict the "black box."

Dr. Word's testimony at the admissibility hearing on Monday, however, had been a persuasive and cogent criticism of the TrueAllele testing modality and of its application in this case in several regards. In Dr. Word, the "black box" had met its match. The jury was entitled to all of the information that had been developed on Monday. The appellant, moreover, was entitled to have that information presented to the jury.

Dr. Word's testimony at the trial on Wednesday, by contrast, turned out to be a muddle. She need not even have been called to the stand. In the course of the direct examination and the redirect examination of Dr. Word, there were 30 objections with 26 of them being sustained. By way of further interruption to the smooth flow of her testimony, counsel were called to bench conference 18 times. Whereas Dr. Word's attack on the reliability of TrueAllele testing at the admissibility hearing had been one of persuasive and convincing substance, what she was finally permitted to say at the trial proper was very thin gruel. It was not a smooth read. If a hard read for appellate review, it was an even harder audit for twelve lay jurors. In a word, there was no defense. The "black box" über alles!

Early on in the trial testimony of Dr. Word, she was asked to explain the process of "using mathematical equations, mathematical algorithms that are put into a computer process" and how "some predictive information is based on the date input and the assumptions made on that date." The limited nature of the State's agreement to Dr. Word's qualifications as an expert witness became clear.

> [THE STATE]: Your Honor, at the motions hearing and even today

Dr. Word has indicated that she was never able to take a sample and put it all the way through a system like True Allele which is the problem. <u>So I'm not sure how she can testify as an expert in this area</u> and that's why I indicated that I would only -- I would concede to the fact that <u>she is an expert in the field of only forensic DNA analysis and interpretation.</u>

(Emphasis supplied).

After interminable wrangling, the State's objection was sustained. In closing argument to the jury, the State stressed that Dr. Word was not an expert on TrueAllele testing.

Now, the defense brought in Dr. Word and she's an expert. <u>She's an expert in DNA analysis and interpretation and that's all she's an expert in.</u> You hear her testify that she said that she has run conferences where she brings in Dr. Chroman, these other doctors who have created and run programs like TrueAllele and some of the other ones that were mentioned like STR Mix. But <u>she also said, she never ran an entire sample all the way through.</u> She did parts of one on a different system other than TrueAllele, but <u>she has never actually run a sample.</u> Even when she worked at Cellmark for 15 years, she was in technical review. <u>She never put samples through.</u> Not like Mr. Heibert where that is his entire job is to run samples.

(Emphasis supplied).

Shortly thereafter, the State returned to that theme.

<u>But yet, she is not an expert in that because she has never even ran a sample through.</u> She can talk about it to say like it exists. Like I can talk about that Mars exists but I've never been to Mars. I can't tell you what the ground looks like on Mars. I'm not going to be an expert in that. <u>Just because I attend a couple of workshops and bring speakers in, essentially a coordinator, doesn't make me an expert.</u>

(Emphasis supplied).

Between the admissibility hearing on Monday and the trial proper on Wednesday, Dr. Word had somehow been stripped of her expertise on the most critical factor to be considered by the jury—the reliability of TrueAllele testing. Would testimony that would

have been competent to bar admissibility as a matter of law not have been competent to raise a reasonable doubt as a matter of fact? Why would testimony that was competent on Monday not have been equally competent on Wednesday on essentially the same issue?

**Theoretical Reliability Versus <u>Ad Hoc</u> Reliability**

Any attack on the general admissibility of the testing procedure could obviously also serve as a legitimate attack before the jury on the persuasive weight of the results produced by the procedure. In that sense, the attack would be on the abstract or theoretical reliability of basing the procedure on certain scientific principles. That, of course, is reliability as it bears on the general admissibility of the procedure at an admissibility hearing before a judge as a matter of law. The same theoretical reliability (or unreliability) would, of course, be proper argument before the jury as it assessed the persuasive weight of the test result.

Also fair game before the jury on the question of weight, however, would be reliability not in the sense of the general or theoretical reliability of the testing methodology but <u>ad hoc</u> reliability in the way the test was performed on a particular occasion. In <u>Armstead v. State</u>, 342 Md. at 66, Judge Raker pointed out that challenging "the manner in which a particular test was conducted" is a valid attack on the persuasive weight of the test result.

> The statute does, however, permit <u>case-specific challenges to the manner in which a particular test was conducted. [T]hese particularized challenges</u> ordinarily will <u>go to the weight of the evidence rather than its admissibility[.]</u>

(Emphasis supplied).

In this case, there were two pertinent attacks not aimed at the abstract validity of the

41

test itself but, rather, at "the manner in which [this] particular test was conducted." In this case, the appellant's attack on the quantitative DNA sample subject to the TrueAllele testing was an attack on the performance of the test in this case, not an attack on the test in a theoretical sense. The very pointed defense attack on the fact that Mr. Heibert chose, subjectively, to program the computer with the assumption that there had been only two contributors rather than three or more was just a limited attack on the performance of the test on this particular occasion rather than an attack on the test in a theoretical sense.

In that sense, these two ad hoc attacks on the performance of the test really had no business being before the court at Monday's admissibility hearing. They were not attacks on the theoretical basis of TrueAllele testing. The most impeccable of testing procedures could be performed on occasion in a shoddy manner, and the latter would not impugn the former.

By the same token, the court's decision on admissibility generally decided nothing with respect to the highly particularized attacks simply on the test performance. At the admissibility hearing, the issue of ad hoc performance on this occasion would have been irrelevant. With respect to these two sub-issues, therefore, for the judge to announce that reliability had already been decided was simply wrong. Ad hoc reliability as to the manner of the test performance had not been decided. A ruling that the test itself was admissible was not a ruling that Mr. Heibert had performed it correctly.

**Quantitative Insufficiency Of The Sample**

Quite aside from the general acceptability of the testing modality, there are obvious questions about the actual application of the test to the particular DNA sample in the case.

42

When there is an extremely small amount of DNA available, there is clearly the question of whether there is enough DNA to permit valid testing.

In Monday's admissibility hearing in this case, there were repeated references by both sides to the very small sample in this case. The State's expert, Mr. Heibert, had acknowledged:

> THE WITNESS: It's possible that there is some degradation. It's difficult to determine because it's such a low-level profile. So there's so little DNA there, it's hard to determine whether it's degraded or whether it's just due to the low amount of DNA.

(Emphasis supplied).

At one point in the trial proper, the trial judge sustained a State objection to Dr. Word's testimony in the following terms:

> THE COURT: . . . . Now she has testified in this case that interpreting the data that Mr. Heibert used using TrueAllele and she used the manual method, she felt with the low level of DNA that the manual was best. What you're after now with her is to whether she thinks TrueAllele, is reliable on low level mixtures, That's what you want her to say.
>
> [THE STATE]: Yes, based on what she knows about the program.
>
> THE COURT: Okay. I'm going to sustain.

(Emphasis supplied).

### Two Minor Contributors Or More

For DNA testing purposes, a mixed DNA sample is one where the total DNA sample consists of contributions made by two or more persons. The DNA in this case was such a mixed sample. The major contributor to the DNA swab in this case turned out to have been one Heather Ladd, whose major contribution to the DNA swab had occurred some five

years earlier and who is absolutely irrelevant to the issue before us. The pertinent issue is that of whether there was one or more than one minor contributor to the mixed sample found on the gun.

The difference between programming the computer with the assumption of one minor contributor and the very different assumption of two minor contributors would produce dramatically different results because of probabilistic genotyping. The court refused, however, to let the defense go into this.

> [DEFENSE COUNSEL]: I do believe that Dr. Word should be able to testify about her opinion about the reliability of probabilistic genotyping systems like TrueAllele and I believe she would state that under these circumstances that they have not proven these systems to be reliable for samples like the gun.
>
> THE COURT: Okay. I note your objection.
>
> . . . .
>
> THE COURT: Objection sustained. Let's move on.

(Emphasis supplied).

Permeating the entire recurring pattern of the State's objecting and of the court's sustaining of the objections was the court's position that Dr. Word was questioning TrueAllele's reliability and that the reliability issue had already been decided on Monday.

> [DEFENSE COUNSEL]: Based on what you know about probabilistic genotyping, what is your opinion as to whether or not it has been proven that probabilistic genotyping systems can appropriately (inaudible)?
>
> [THE STATE]: That goes to reliability, Your Honor. She's already testified that --
>
> THE COURT: I really -- you know, [defense counsel], I think with

44

> _Dr. Word you've made your point_ and I think that -- _and I have told you, I_
> _-- I made my ruling. This is why you presented all this before me on Monday._
>
> [DEFENSE COUNSEL]: _Right._
>
> THE COURT: _I've made my ruling on reliability_ of the -- _I didn't find_
> _that anything was so unreliable._

(Emphasis supplied).

As the computer is programmed to make its TrueAllele DNA comparisons, the assumption that is the key part of that programming may be critical as to the outcome of the test. This is one of the inevitable consequences of what is called probabilistic genotyping methodology. In this case, for instance, programming the computer with the assumption that there were two contributors to the DNA swab on the revolver (Heather Ladd as the major contributor and one other minor contributor) led to the result that the appellant could probabilistically be considered the minor contributor. Programming the computer with the assumption that there were three contributors (two minor contributors), on the other hand, would not have identified the appellant as a likely minor contributor. He would have been excluded.

Determining the assumption or assumptions with which to program the computer is a subjective decision made by the person conducting the TrueAllele test. It was, moreover, an absolutely critical decision to have made in this case. At Monday's admissibility hearing, the acknowledgement of Mr. Heibert was revealing. The assumption he programmed into the computer was that there were two contributors, one of them being the minor contributor.

> A. _The only thing to put in is how many contributors, how many_

45

people, to look for and how long to run. So the longer you run, the more precise your results.

>Q. And how many contributors did you tell TrueAllele when you ran it the first time?

>A. Two.

(Emphasis supplied).

Mr. Heibert acknowledged, on Monday, that the assumption chosen was a subjective determination.

>How did you come to that determination for two contributors?

>A. By looking at the profile, I determined that most likely it was two contributors. There is a possibility of a third, but I did not think that if there was a third it would be informative enough for TrueAllele to find a good profile.

(Emphasis supplied).

On cross-examination, Mr. Heibert admitted, on Monday, that there could have been three (or more) contributors, but that he did not ask the computer to make that additional calculation.

>Q. Okay. So there could be two people. There could be three, correct?

>A. Yes.

>Q. And there could be more?

>A. Yes, but it's unlikely that there's any more than three.

>Q. Unlikely any more than three?

>A. Yes.

(Emphasis supplied).

46

The determination of how many contributors there were can be complicated by such other factors as "drop in alleles" and "drop out alleles."

> Q. And <u>that's an indication that this is a mixture of at least three people, not two people, correct?</u>

> A. <u>It's possible that there are three people, but it's also possible that one of those alleles could be drop in.</u>

(Emphasis supplied).

Mr. Heibert conceded, on Monday, that he could have ordered an additional test on the assumption that there could have been three contributors but that he did not do so.

> But as I said, though <u>I was uncertain of the exact number of contributors, I felt as though two contributors was the best assumption</u> given the data I had.

> Q. <u>But given the fact that there was evidence that this could be a three-contributor mixture, your SOP says let the computer assess the data under different assumptions. You never had the computer assess this data under the assumption of three contributors?</u>

> A. <u>No, I did not.</u>

> Q. <u>And you have no idea how the likelihood ratio would change had the computer assessed the data under that assumption?</u>

> A. <u>No, I can't be sure.</u>

(Emphasis supplied).

On the critical question of which assumption to program into the computer, Dr. Word, on the other hand, felt that a three-contributor assumption would have been preferable to a two-contributor assumption. She testified on Monday:

> There's clearly a low-level minor, one or more minor contributors. <u>It's not possible to know whether it's two or three or four or five contributors in this mixture. We simply don't know that.</u>

47

It could be evaluated under those different scenarios, and there's reasons to do it under those different scenarios. I think there's a pretty high likelihood this is not a two-person mixture. It's probably more likely a three or even more person mixture.

THE COURT: So then what you're saying based on the data -- you would have come to a different interpretation of it than Mr. Heibert did.

THE WITNESS: Well, I don't have the TrueAllele system available to me, so I suspect if I plugged in this data in the same way that he did into TrueAllele, based on what I know about the system, I would probably generate similar -- a similar likelihood ration. It could be a little higher or a little lower.

But I'm not sure -- I don't -- I'm not confident that only looking at a two -- using it as a two-person mixture is appropriate.

THE COURT: Well, I guess that you're saying -- he should have put in more than a two-person contributor?

THE WITNESS: That's correct.

THE COURT: That's what you're saying.

THE WITNESS: That's correct.

(Emphasis supplied).

Dr. Word's conclusion would have excluded the appellant from being the minor contributor.

A. My conclusion is that there are genotypes present that are not consistent with Mr. Morten. Under the assumption of only two contributors with only one minor, he cannot be the minor. And he's certainly not the major contributor. So he would be excluded under that set of assumptions as a contributor.

(Emphasis supplied).

That absolutely crucial defense testimony, however, was before the admissibility hearing on Monday but was not before the jury on Wednesday. When counsel attempted

48

to explore on Wednesday the crucial mistake that could be made by programming the wrong assumption into the computer about the number of contributors, that testimony was precluded. She had been expert enough on Monday but was no longer expert enough on Wednesday.

> [DEFENSE COUNSEL]: I think my question was <u>tell us whether the likelihood ratio statistic would be affected if the computer assumed three rather than two contributors.</u> And she's been qualified as an expert on statistical analysis.
>
> THE COURT: Well, you don't have to say all that, [defense counsel]. What's your objection?
>
> [THE STATE]: So one; leading and two; <u>she was not qualified as an expert in statistical analysis. I specifically said that she was only qualified</u> --
>
> THE COURT: <u>Yeah, that's true, she was not.</u> So --
>
> [DEFENSE COUNSEL]: But she has experience.
>
> THE COURT: <u>Well, no, she's not qualified. She can't give an expert opinion on that.</u> You can rephrase that question to whatever you want, but the first one she's right, you were leading and <u>she's not qualified as to statistical analysis. You offered her not as that.</u>

(Emphasis supplied).

## Reliability Is Both A Continuum
## And Various Points On The Continuum

Gertrude Stein to the contrary notwithstanding, it is not necessarily true that reliability is reliability is reliability. Sometimes it is not. Reliability alpha must not be confused with reliability beta. Reliability is protean.

Reliability in the context of Monday's general admissibility issue may have been decided, but reliability in the very different context of jury persuasion had not been

decided. Reliability alpha may have been decided but reliability beta had not remotely been decided. Reliability is not a monolith.

At that point, of course, the court was comparing apples and oranges. That misconception as to what had or had not already been decided permeated Dr. Word's entire testimonial appearance at the trial proper on Wednesday. Monday's legal decision should not in any way have inhibited the purely evidentiary decision on Wednesday. The legal decision on Monday, of course, had been that the DNA testing was automatically admissible pursuant to Courts and Judicial Proceedings Article, Sect. 10–915(b)(3) and the fact that the DNA testing has been validated by the Federal Bureau of Investigation's Quality Assurance Standards for DNA Testing Laboratories. That did not address in any way its persuasive impact, or lack of impact, on the jury.

Admissibility of a test result as a matter of law, however, does not in any way limit the opponent of the evidence from challenging its persuasive weight as a matter of fact. Even in the face of admissibility, the opponent of the evidence is fully entitled to challenge the evidence by various means, as Judge Friedman had observed in Phillips v. State.

> This is not to say that Phillips could not challenge the DNA evidence on the basis of a lack of stochastic threshold. Rather, it is our view that the proper avenue to do so was either to cross-examine Charak or to call a rebuttal expert to attack the weight of the evidence.

226 Md. App. at 22–23 (emphasis supplied).

For the Court of Appeals in its Phillips v. State, Judge Getty was in emphatic agreement. The issue of admissibility is only the opening round. The defendant still enjoys an inalienable right to expose the weaknesses of and to diminish the weight of the test

results being offered against him. Threshold admissibility, as a matter of law, does not establish ultimate persuasion, as a matter of fact.

> That the DNA evidence was automatically admissible under the Statute does not mean that Mr. Phillips was entirely unable to challenge such evidence. Mr. Phillips could have attacked the weight to be given the DNA evidence based on the lack of an accepted standard for analyzing complex, low-template DNA samples by either cross-examining Ms. Charak at trial or calling a rebuttal expert as he did at the pretrial hearings.

451 Md. at 207 (emphasis supplied).

In instance after instance, Dr. Word was prevented on Wednesday from pointing out before the jury many of the challenges to TrueAllele testing that she had voiced on Monday. Throughout Dr. Word's testimony on Wednesday, the trial judge made it repeatedly clear that she believed that many of the attacks that Dr. Word was attempting to make on the TrueAllele testing modality were attacks on the system's reliability and that the court had already ruled on reliability and that that settled the matter.

Defense counsel attempted to get Dr. Word to explain that there were limits to the system that had not yet been tested. The ruling again was that the question challenged TrueAllele's reliability and that reliability had already been ruled upon.

> [DEFENSE COUNSEL]: So I think that's exactly what her opinion is going to be, that in fact, we don't know the limits of the system and that's the problem.
>
> THE COURT: But that goes to reliability.
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: And I've already ruled on that.

(Emphasis supplied).

51

At the close of Wednesday's proceeding, the court went so far as to tell the defense that it would not be permitted to argue the issue of TrueAllele's reliability to the jury.

> [DEFENSE COUNSEL]: You asked me about relevance.
>
> THE COURT: <u>We're way past this reliability thing because I've already made that ruling and I told you</u> --
>
> [DEFENSE COUNSEL]: So what I need to do then --
>
> THE COURT: -- <u>that the Defense would not be arguing reliability to the jury.</u>
>
> [DEFENSE COUNSEL]: Well, <u>I think we have the absolute right to argue upon reliability.</u>
>
> THE COURT: <u>And I said you won't.</u>

(Emphasis supplied).

Just before jury argument commenced, however, the judge ruled that defense counsel would, indeed, be permitted to argue reliability to the jury on the ground that the State had opened the door to the reliability argument. It was, however, a hollow victory. Defense counsel could argue reliability, but defense counsel could only argue the limited evidence that Dr. Word had been permitted to offer. Defense counsel may have been permitted to fire away rhetorically, but the defense arsenal was effectively bereft of ammunition. We hold that the appellant was at two or three critical junctions erroneously prohibited from challenging the TrueAllele test results that linked him to the ostensible murder weapon.

**JUDGMENT VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**